**Slip Op. 25-60**

# UNITED STATES
# COURT OF INTERNATIONAL TRADE

**Court No. 23-00221**

BYD (H.K.) CO., LTD.,

*Plaintiff*,

and

FLORIDA POWER & LIGHT COMPANY,

*Plaintiff-Intervenor*,

v.

UNITED STATES,

*Defendant*,

and

AUXIN SOLAR INC.,

*Defendant-Intervenor*.

Before: M. Miller Baker, Judge

## OPINION

[Sustaining the Department of Commerce's circumvention determination.]

Dated: May 16, 2025

*Craig A. Lewis*, *Nicholas W. Laneville*, and *Gregory M.A. Hawkins*, Hogan Lovells US LLP, Washington, DC, on the briefs for Plaintiff.

*Matthew R. Nicely*, *Daniel M. Witkowski*, and *Julia K. Eppard*, Akin Gump Strauss Hauer & Feld LLP, Washington, DC, on the briefs for Plaintiff-Intervenor.

*Brian M. Boynton*, Principal Deputy Assistant Attorney General; *Patricia M. McCarthy*, Director; *Reginald T. Blades, Jr.*, Assistant Director; and *Stephen C. Tosini*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, on the brief for Defendant. Of counsel on the brief was *Spencer C. Neff*, Attorney, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, Washington, DC.

*Baker*, Judge: Plaintiff BYD (H.K.) Co. challenges the Department of Commerce's finding that solar cell imports from Cambodia circumvent antidumping and countervailing duty orders on such equipment made in China. As explained below, the court sustains the agency's determination.

I

The Tariff Act of 1930, as amended, allows Commerce to impose antidumping or countervailing duties on a "class or kind" of imported merchandise if it "finds that the merchandise reflects unfair pricing or unfair subsidization and the [International Trade] Commission finds material injury to the domestic industry." *Canadian Solar, Inc. v. United States*, 918 F.3d 909, 917 (Fed. Cir. 2019) (citing 19 U.S.C. §§ 1671(a)(1), 1673(1)). In imposing such duties, the Department

must "include 'a description of the subject merchandise, in such detail as [it] deems necessary.'" *Id.* (emphasis removed) (quoting 19 U.S.C. §§ 1671e(a)(2), 1673e(a)(2)). The statute "defines 'subject merchandise' as 'the class or kind of merchandise that is within the scope of an investigation [or] an order under this subtitle.'" *Id.* (quoting 19 U.S.C. § 1677(25)). In practice, Commerce describes the product "within the scope of the order[ ]" by reference to its "technical characteristics" and "country of origin" (sometimes referred to in this opinion as the "source country"). *Id.* at 913.

The Department "typically determines country of origin based on the country where the merchandise is processed or manufactured." *Id.* But in trade, as in war, the antagonist gets a vote. To avoid duties, a producer may "finish[ ] or assemble[ ]" its products "in a different country" using components manufactured in the source country. *Bell Supply Co. v. United States*, 888 F.3d 1222, 1228 (Fed. Cir. 2018). Whether the final product as exported from the third country is deemed to originate from the source country depends on whether it was "substantial[ly] transform[ed]" in the former. *Id.*

"A substantial transformation occurs where, as a result of manufacturing or processing steps, the product loses its identity and is transformed into a new product having a new name, character and use." *Id.* (cleaned up) (quoting *Bestfoods v. United States*,

165 F.3d 1371, 1373 (Fed. Cir. 1999)). If such a trans-formation occurs, the third country becomes the country of origin, and the product is out-of-scope. *Id.* at 1230. Otherwise, such goods are deemed to originate from the source country, meaning they're in-scope. *Id.*

Even if substantially transformed in a third country, the products finished or assembled there from source-country components are not necessarily home free, as it were. As relevant here, the statute's anticir-cumvention provision, 19 U.S.C. § 1677j, authorizes—but does not require—Commerce to extend antidump-ing and countervailing duty orders to such articles when certain other conditions are satisfied. *See id.* § 1677j(b)(1); *see also Bell Supply*, 888 F.3d at 1230 (explaining that if the Department "applies the sub-stantial transformation test and concludes that the imported article has a country of origin different from the country identified in an AD or CVD order, then [it] can include such merchandise within the scope of [such an] order only if it finds circumvention under § 1677j").

For there to be circumvention, imports "completed or assembled" in a third country from source-country components must be "of the same class or kind" as goods subject to the duty order. 19 U.S.C. § 1677j(b)(1)(A), (B). The "process of assembly or com-pletion" has to be "minor or insignificant." *Id.* § 1677j(b)(1)(C). The value of the parts made in the source country must also be "a significant portion of

the total value" of the product as finally exported to this nation. *Id*. § 1677j(b)(1)(D). Finally, "action [must be] appropriate . . . to prevent" avoidance of duty orders. *Id*. § 1677j(b)(1)(E).

If Commerce finds those conditions satisfied, it must then determine whether to extend the orders to the third-country goods. In doing so, it must "take into account" certain considerations. *Id*. § 1677j(b)(3). As relevant here, they include any "affiliat[ion]" between the company doing the "assembl[y] or complet[ion]" and the manufacturer or exporter of source-country parts or components. *Id*. § 1677j(b)(3)(B).

In many anticircumvention cases, including this one, the crux of the controversy is the "minor or insignificant" condition under § 1677j(b)(1)(C). As to that question, Commerce must "take into account" certain factors regarding operations in the third country. They are "(A) the level of investment"; "(B) the level of research and development"; "(C) the nature of the production process"; "(D) the extent of production facilities"; and "(E) whether the value of the processing performed" there "represents a small proportion of the value of the merchandise imported into the United States." *Id*. § 1677j(b)(2). "Commerce will evaluate each of these factors . . . , depending on the particular circumvention scenario. No single [one] will be controlling." *Statement of Administrative Action Accompanying the Uruguay Round Agreements Act* (SAA), H.R.

Doc. 103–316, vol. 1, at 893, 1994 U.S.C.C.A.N. 4040, 4216.[1]

II

In 2012, Commerce issued orders imposing antidumping and countervailing duties on solar cells made in China.[2] *See* 77 Fed. Reg. 73,018; 77 Fed. Reg. 73,017. A decade later, domestic producer Auxin Solar Inc. asked the Department to investigate whether

---

[1] The SAA is an "authoritative expression" of the statute's meaning. 19 U.S.C. § 3512(d).

[2] In technical jargon, the orders cover "crystalline silicon photovoltaic cells, . . . whether or not partially or fully assembled into other products, including, but not limited to, modules, laminates, panels and building integrated materials." Appx0001019. According to the Energy Department, a solar cell "is a nonmechanical device that converts sunlight directly into electricity." https://www.eia.gov/energyexplained/solar/photovoltaics-and-electricity.php. "Individual cells can vary from 0.5 inches to about 4.0 inches across." *Id.* One such cell "can only produce 1 or 2 Watts, which is only enough electricity for small uses, such as powering calculators or wristwatches." *Id.* Cells can be "electrically connected in a packaged, weather-tight . . . *panel* (sometimes called a *module*)." *Id.* (emphasis in original). In plain English, a solar panel is an assembly of linked solar cells.

A solar cell, in turn, is created by "the addition of a p/n junction" to a solar wafer. Appx0001205 (Commerce so noting); ECF 36, at 9 (BYD, citing prior agency decisions). For purposes of the orders, that is the key manufacturing step that determines the country of origin. Appx0001205.

such merchandise imported from Thailand, Cambodia, Vietnam, and Malaysia circumvented those orders. *See* 87 Fed. Reg. 19,071. The agency did so and selected BYD as a mandatory respondent for the Cambodian segment. Appx0003958.

A

Commerce preliminarily determined that all conditions in 19 U.S.C. § 1677j(b)(1) were satisfied and that—with certain exceptions not applicable here—extending the duty orders to solar cell exports from Cambodia was appropriate. *See generally* Appx0001015–0001037.

One of those conditions disputed here is whether the process of assembly or completion in Cambodia was minor or insignificant. *See* 19 U.S.C. § 1677j(b)(1)(C). Of the five statutory factors bearing on this condition*, see id.* § 1677j(b)(2)(A)–(E), the Department found that all but one (the "nature of the production process," *see id.* § 1677j(b)(2)(C)) indicated circumvention. *See generally* Appx0001027–0001033.

Explaining those findings, the Department observed that BYD does not directly engage in production of solar cells and modules in Cambodia. Instead, it provides inputs to unaffiliated "tollers," who do the

work.[3] Appx0001025. The tollers, in turn, own their own manufacturing equipment and facilities.[4] Appx0001176. The company provided Commerce with information about the scale of the tollers' investments, infrastructure, workforce, and production capabilities. Appx0001028, Appx0001032.

The Department nevertheless declined to use that information for purposes of determining the "level of investment" (§ 1677j(b)(2)(A)) and "extent of production facilities" (§ 1677j(b)(2)(D)) in Cambodia. Limiting its consideration instead to BYD's non-existent activities, it found that those factors indicated circumvention. Appx0001028; Appx0001032.

---

[3] "[T]oll processing"—also known as "toll manufacturing"— "is '[a]n arrangement under which a customer provides the materials for a manufacturing process and receives the finished goods from the manufacturer. . . . The same party owns both the input and the output of the manufacturing process. This is a specialized form of contract manufacturing.'" *Wind Tower Trade Coal. v. United States*, 569 F. Supp. 3d 1221, 1226 n.3 (CIT 2022) (quoting *Toll Manufacturing*, Black's Law Dictionary (11th ed. 2019)).

[4] The record is inconsistent regarding the degree to which the tollers owned versus leased their facilities. *Compare* Appx0001176 (Commerce stating that the Cambodian manufacturing "facilities/equipment were purchased/ owned by the . . . tollers") *with id.* (stating that "the tollers leased their facilities"). As the parties appear to assume the former, so does the court.

As to R&D (§ 1677j(b)(2)(B)), Commerce observed that BYD reported that neither it nor its tollers undertook any. Appx0001029. Thus, the Department found that this factor also indicated circumvention. *Id*.

To determine the value added by Cambodian processing (§ 1677j(b)(2)(E)), the Department summed BYD's toller costs and divided the result by the per-unit weighted average value of the company's U.S. sales. Appx0001003. That "exceeded a third," ECF 36, at 39, which the agency found to be a small proportion and thus to indicate circumvention. Appx0001003.

On the other hand, Commerce determined that the final relevant factor, the nature of the Cambodian processing (§ 1677j(b)(2)(C)), cut in the other direction. Appx0001032. That's because, compared to the production of precursor components in China, "solar cell and module production involves a greater number of stages, each requiring a high level of technological sophistication." Appx0001031. In marked contrast to its disregard of the tollers' activities in connection with investment and production facilities (§§ 1677j(b)(2)(A) and (D)), in this context the Department treated them as proxies for BYD: "[W]e find that the nature of the production *performed by the respondents* in the third country is not minor or insignificant compared to" the production of precursor components in China. Appx0001032 (emphasis added).

In balancing the § 1677j(b)(2) considerations, Commerce acknowledged that "record evidence shows that

the nature of the production process in Cambodia for solar cells and modules is significant." Appx0001036. Nevertheless, for the reasons discussed above the level of investment and extent of production facilities pointed in the opposite direction. *Id*. The company's "insignificant amount" of R&D was of "particular importance" in view of "the uniquely complex nature of solar cell and module production." *Id*. Under the "totality of the factors," the agency found "the process of assembly or completion in Cambodia" to be "minor and insignificant." *Id*.; *see also* 19 U.S.C. § 1677j(b)(1)(C).

The second disputed statutory condition here involves the Department's finding that the Chinese components of BYD's solar cell exports from Cambodia to this nation were "a significant portion of the total value" of the finished products. *See* Appx0001033 (discussing 19 U.S.C. § 1677j(b)(1)(D)). Noting that China is a nonmarket-economy country, the agency used surrogate data from market-economy countries, rather than the prices BYD paid, to value the Chinese-produced inputs. *Id*.

The third and final disputed statutory condition is Commerce's finding—without any supporting reasoning—that "action is warranted to prevent evasion of the Orders." Appx0001037 (citing 19 U.S.C. § 1677j(b)(1)(E)).

B

After receiving comments from interested parties, the Department reaffirmed its findings with some minor modifications and, as relevant here, additional explanation. *See* Appx0001196–0001363.

As to its conclusion that BYD's process of assembly or completion in Cambodia was "minor or insignificant" under 19 U.S.C. § 1677j(b)(1)(C), the agency discussed the relevant § 1677j(b)(2) factors. For R&D, it observed that the company "agree[d] with" its finding that there was no such activity in Cambodia, and only contested its relative significance. Appx0001257. In response, Commerce emphasized that the China-based R&D is of "preeminent importance in the solar industry," as it "has been key for technological breakthroughs." *Id.* In these "particular circumstances," the agency attached great weight to this factor. *Id.*

The Department also responded to BYD's objections as to its findings about the "level of investment" and "extent of production facilities" factors. Defending its decision to disregard the tollers' activities because those entities were "unaffiliated" with the company, Appx0001246, the agency asserted that it had the discretion to base its findings on the "particular circumvention scenario." Appx0001245–0001246 (quoting SAA at 893, 1994 U.S.C.C.A.N. at 4216).

In a similar vein, Commerce justified its decision to evaluate investment "on an absolute basis as opposed

to a per-unit basis." Appx0001213. It noted that the "statute does not instruct [the agency] to employ a particular analysis." *Id*. Using a per-unit comparison would underweight the magnitude of the investment for establishing the precursor "ingot and wafer production facilities in China." *Id*. It would also distort the results because Chinese economies of scale allowed for "lower-per unit investment costs." Appx0001213–0001214.

The Department also responded to BYD's critique of its finding that the "value of processing" in Cambodia was a "small proportion of the value of the merchandise imported into the United States." Appx0001259 (quoting 19 U.S.C. § 1677j(b)(2)(E)). The agency rejected the company's argument that "value" encompasses monetary *and* qualitative considerations. Appx0001259–0001261. It also explained that its calculation here—greater than one-third—was comparable to ratios it had previously "found . . . to be minor." Appx0001261.

Commerce then answered BYD's challenge to its conclusion that the "value" of the Chinese components was a "significant portion" of the "total value" of the solar cells exported to this country. Appx0001239; 19 U.S.C. § 1677j(b)(1)(D). In response to the contention that it should have used the prices the company paid for Chinese parts rather than surrogate data from market-economy countries, the agency explained that neither the statute nor agency regulations "describe

how . . . to determine 'value.'" Appx0001239. Because the inputs were produced in a nonmarket-economy country, their prices "could be distorted" by government controls. Appx0001240.

Finally, the Department addressed whether action was "appropriate . . . to prevent evasion" of the orders. Appx0001271 (quoting 19 U.S.C. § 1677j(b)(1)(E)). It explained that extending them to Cambodian solar cells was necessary because the other statutory conditions "were met, and the factors under [§ 1677j(b)(3)] further evinced the existence of circumventing behavior, and because [nothing] suggested that circumvention would cease absent" such action. *Id.*

## III

Invoking jurisdiction conferred by 28 U.S.C. § 1581(c), BYD brought this suit under 19 U.S.C. §§ 1516a(a)(2)(A)(ii) and (a)(2)(B)(vi) challenging the Department's final determination. Florida Power & Light (FPL), an importer of Cambodian solar cells, intervened as a plaintiff, while Auxin did likewise as a defendant. The parties have fully briefed BYD's and FPL's motions for judgment on the agency record, which are ripe for disposition.

In § 1516a(a)(2) actions such as this, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The question

is not whether the court would have reached the same decision on the same record. Rather, it is whether the administrative record as a whole permits Commerce's conclusion.

> Substantial evidence has been defined as more than a mere scintilla, as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. To determine if substantial evidence exists, we review the record as a whole, including evidence that supports as well as evidence that fairly detracts from the substantiality of the evidence.

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (cleaned up); *see also SSIH Equip. S.A. v. U.S. Int'l Trade Comm'n*, 718 F.2d 365, 382 (Fed. Cir. 1983) (if Commerce makes a choice between "two fairly conflicting views," the court may not substitute its judgment even if its view would have been different "had the matter been before it *de novo*") (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

## IV

### A

In concluding that "the process of assembly or completion" in Cambodia is "minor or insignificant," 19 U.S.C. § 1677j(b)(1)(C), as explained above Commerce made affirmative findings on four of the five

§ 1677j(b)(2) considerations—all but the "nature of the production process" in that country. BYD and FPL attack the Department's balancing of these factors as well as its conclusions as to three of them.

1

BYD first contends that Commerce erred as a matter of law in finding the "process of assembly or completion" in Cambodia "minor or insignificant." ECF 36, at 30–39. The company asserts that the agency's "inquiry should have ended as soon as it found that the value-added in Cambodia exceeded a third and the nature of the Cambodian processing—the processing at the heart of [the] inquiry—was neither minor nor insignificant. But it did not." *Id.* at 39.

The problem for BYD is that § 1677j(b)(2) requires the Department to consider and balance *all five* factors, not just the company's preferred ones. That's what the agency did here: It weighed them based on the record before it. To contend that it erred as a matter of law because it refused to limit its analysis to a subset of the mandatory considerations flies in the face of the statute.

Taking a different tack, FPL argues that Commerce erroneously balanced the § 1677j(b)(2) factors. *See* ECF 38, at 12–17. As the company sees it, the Department's "nature of the production process" findings show that solar cell manufacturing operations in Cambodia "are significant, extensive, and complex." *Id.* at

14. They also demonstrate "the addition of substantial value." *Id.* at 15.

Although the record might have permitted the Department to reach such a conclusion, it did not *compel* such a result. "Where two different, inconsistent conclusions may reasonably be drawn from the evidence in [the] record, an agency's decision to favor one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence." *In re Morsa*, 713 F.3d 104, 109 (Fed. Cir. 2013) (brackets omitted) (quoting *In re Jolley*, 308 F.3d 1317, 1329 (Fed. Cir. 2002)). As the agency reasonably explained the basis for its weighing of the § 1677j(b)(2) factors, including its finding that R&D in the solar industry context was of "preeminent importance," Appx0001257, FPL's argument that it should have reached a different result is unavailing.

2

BYD complains that "Commerce improperly placed decisive weight on the importance of R&D" because "[n]othing in the text of the statute indicates that [it] should be afforded 'particular importance.'" ECF 36, at 57. The company also argues that as the SAA teaches that "no single [§ 1677j(b)(2)] factor will be controlling," *id.* (quoting SAA at 893, 1994 U.S.C.C.A.N. at 4216), the Department may not "afford R&D determinative status," *id.* at 57–58.

The company misreads both the statute and the SAA. Commerce must consider the five § 1677j(b)(2) factors "depending on the particular circumvention scenario." SAA at 893, 1994 U.S.C.C.A.N. at 4216. No single one is controlling *as a matter of law*, but the statute permits the Department to balance them based on the record evidence in any given case. Here, the agency did that and reasonably explained why it assigned preponderant weight to R&D. *See* Appx0001257 (explaining that the China-based R&D is of "preeminent importance in the solar industry," as it "has been key for technological breakthroughs"). The record supports that weighting, even if a different finder of fact might have reached a different conclusion. *Cf. Morsa*, 713 F.3d at 109.

BYD also contends that Commerce's weighting of R&D contradicts agency precedent. ECF 36, at 58–59. In the cited decisions, however, the agency simply assigned less weight to R&D based on the facts before it. That it assigned greater weight here is not a contradiction but instead merely reflects the differing record evidence in this case. It should go without saying—but apparently it needs restating—that each case turns on its own facts.[5]

---

[5] In passing, BYD also appears to challenge the Department's R&D *finding* on the ground that the agency did not consider the tollers' activities. *See id.* at 57. This half-hearted contention fails for two reasons.

3

BYD challenges the failure to include the tollers' operations in evaluating the "level of investment" and "extent of production facilities" factors (§§ 1677j(b)(2)(A) and (D)). ECF 36, at 39–40. It insists it was unlawful for the Department not to consider their activities. *Id.* at 40. According to the company, the agency must examine, "without qualification," the process of assembly or completion in the third country and decide whether it is minor or insignificant. *Id.* at 41. "Quite simply, for purposes of the circumvention analysis, it is what *goes on* in the inquiry country that is at issue, not *who* does it." *Id.* at 42 (emphasis added). It argues that the statute neither "state[s nor] im-plie[s] that Commerce may choose to disregard pro-

---

To begin with, arguments only made in passing are waived. *See ArcelorMittal France v. AK Steel Corp.*, 700 F.3d 1314, 1325 n.6 (Fed. Cir. 2012). Moreover, before Commerce, the company "*agree[d] with*" the agency's pre-liminary determination that there was no relevant R&D activity in Cambodia, and only contested the relative sig-nificance of the finding. Appx0001257 (emphasis added). Having so failed to contest the Department's finding that Cambodian R&D was minor, it's too late to do so now. *See* 28 U.S.C. § 2637(d) (requiring exhaustion of administrative remedies); 19 C.F.R. § 351.309(c)(2) (requiring parties to submit case briefs that "present all arguments that con-tinue in the submitter's view to be relevant to the [agency's] final determination or final results"). At this stage, the court will only entertain the argument that BYD made be-low—that the agency assigned undue *weight* to its R&D finding.

cessing activities performed in the third country because they are not carried out by the respondent itself." ECF 43, at 11.

FPL, in turn, argues that "[b]y focusing its analysis solely on a company *not involved in production operations* (BYD), while ignoring the data for the Cambodian companies engaged in the actual process of completion or assembly of the imported merchandise (BYD's tollers)," Commerce conducted an incomplete investigation. ECF 38, at 21 (emphasis in original). FPL also contends that the Department's "inability" to verify the tollers' data was a problem of its own making because it knew BYD relied on tollers and could have selected them as additional respondents. *Id.* at 24 (citing Appx0003710–0003723).

The government responds that the statute gives Commerce discretion to consider any affiliation between "the producer in a third country" and the input supplier based in the source country. ECF 41, at 21 (citing 19 U.S.C. § 1677j(b)(3)(B)). It also contends that the Department reasonably exercised that discretion in not including the tollers' activities in assessing the level of investment and the extent of production facilities. *Id.* at 18–22.

The court agrees with BYD that under the statute, "what *goes on* in the inquiry country . . . is at issue, not *who* does it." ECF 36, at 42 (emphasis added); *see* 19 U.S.C. § 1677j(b)(1)(C) (requiring the Department to determine whether "the process of assembly or

completion" in the third country "is minor or insignificant") (emphasis added). As to each § 1677j(b)(2) factor, Commerce must evaluate the relevant aspect of "the process of assembly or completion" without gerrymandering its findings—as it did here—based on the identity of the actor(s) undertaking it.[6]

Contrary to the government's argument, § 1677j(b)(3)(B) does not license Commerce to consider affiliations at the § 1677j(b)(1)(C) stage. As explained today in the court's concurrent opinion in *Canadian Solar International Ltd. v. United States*, Ct. Nos. 23-00222 and 23-00227, Slip Op. 25-59, at 16 (CIT May 16, 2025), the statute requires the Department to undertake an "if/then" analysis. "Only *if* it finds the conditions in § 1677j(b)(1)(A)–(E) satisfied does it *then* consider whether to expand an order to cover a third country. In doing so, it must then consider the § 1677j(b)(3) factors," including affiliation. *Id.* (emphasis in original); *see also* 19 U.S.C. § 1677j(b)(3)(B) ("*In determining whether to include*" products assembled in

---

[6] The court also observes that the Department's erroneous reading of the statute does not even have the benefit of internal consistency. If the tollers' activities are irrelevant, then why did the agency consider them in finding that the "nature of the production process" (§ 1677j(b)(2)(C)) is significant? *See* Appx0001031 ("[T]he process for turning wafers into solar cells requires an expensive, multi-stage assembly line requiring high-technological machinery and workers with strong technological knowledge."). The tollers provided the hi-tech equipment and services of skilled technicians.

a third country in a duty order, Commerce "shall take into account such factors as . . ." any affiliation between the manufacturer or exporter of source-country parts and "the person who uses" those parts "to assemble or complete" the products) (emphasis added). The agency cannot allow § 1677j(b)(3) considerations to "bleed over into its weighing of the § 1677j(b)(2) factors that bear on § 1677j(b)(1)(C)." *Canadian Solar*, Slip Op. 25-59, at 16.[7]

That all said, as in the companion case from Thailand, this legal error was harmless. As BYD acknowledges, the weight Commerce attached to China-based

---

[7] The court observes that even if the § 1677j(b)(3) considerations applied at the stage of determining whether the § 1677j(b)(1) conditions are satisfied, the tollers *were* affiliated with BYD for the statute's purposes if the company could control them under the relevant contracts. *See* 19 U.S.C. § 1677(33)(G) (defining "affiliated" to include "[a]ny person who controls any other person and such other person" and providing that "control" exists when one person "is legally or operationally in a position to exercise restraint or direction over" another); *cf. DeFiore v. SOC LLC*, 85 F.4th 546, 555 (9th Cir. 2023) (noting the "crucial distinction between independent contractors that are agents and independent contractors that are instead non-agent service providers"); *see also Restatement (Second) of Agency* § 14N (1958) ("One who contracts to act on behalf of another and subject to the other's control except with respect to his physical conduct *is an agent and also an independent contractor*.") (emphasis added). On this record, it's unclear whether the tollers were agents or non-agent service providers.

R&D was "determinative" here in balancing the § 1677j(b)(2) factors. ECF 36, at 59.[8] Even if the Department had considered the tollers' activities and flipped its findings about the investment and production facilities factors, *see* § 1677j(b)(2)(A) and (D), the result would have been the same.[9] A remand would be wasteful. *Cf. Al Ghurair Iron & Steel LLC v. United States*, 65 F.4th 1351, 1363 (Fed. Cir. 2023) ("Commerce's finding . . . was supported by many findings other than its [erroneous] calculation of [the plaintiff's] value added.").

4

BYD attacks the agency's finding that "the value of the processing performed in" Cambodia was "a small proportion of the value of the merchandise imported into the United States." ECF 36, at 47–56 (addressing 19 U.S.C. § 1677j(b)(2)(E)). The company first argues that on an absolute basis, the figure calculated here—greater than one-third—cannot be "small." *Id.* at 48–51. It argues that "[i]t is simply unreasonable for

---

[8] FPL endorses BYD's arguments as to R&D. *See* ECF 38, at 17–18.

[9] In Commerce's finding of circumvention in Thailand that the court sustains today, as to one respondent the Department concluded that the process of assembly or completion was minor or insignificant based on the singular importance of R&D, even though the rest of the § 1677j(b)(2) factors pointed in the other direction. *Canadian Solar*, Slip Op. 25-59, at 7–8.

Commerce to have considered this level of processing to be minor or insignificant." *Id.* at 48.

In effect, the company asks the court to legislate a ceiling for determining what is a "small proportion." But there are no "rigid numerical standards for determining the significance of the [§ 1677j(b)(2)] activities." SAA at 894, 1994 U.S.C.C.A.N. at 4217; *cf. Al Ghurair*, 65 F.4th at 1361 n.4 (noting with approval the concession that "Commerce should not be held to a numerical or 'bright-line' test in considering the value added in third-country processing").

It suffices here that the Department observed that in prior cases it "*found similar ratios to be minor*," Appx0001261–0001262 (emphasis added) (citing 85 Fed. Reg. 8823)—a point BYD does not dispute. The court thus rejects the company's contention that Commerce unreasonably found the value added in Cambodian processing to be small. *Cf. Al Ghurair*, 65 F.4th at 1361 n.4 (sustaining the agency's finding that "the value added" in the third country "was insignificant *in view of prior [agency] cases making similar findings*") (emphasis added).[10]

---

[10] BYD also complains that Commerce's value-added finding here contradicts three agency decisions. *See* ECF 36, at 49–50. The Department, however, reasonably explained why it found them unpersuasive. In one, the agency "ranged" the values "by plus or minus 10 percent" and found the § 1677j(b)(2)(E) factor "inconclusive."

Shifting gears, BYD argues that the Department erroneously "failed to evaluate the value added on a qualitative basis as directed by Congress." ECF 36, at 51. To support that proposition, the company purports to quote from the SAA. *See id.* at 53. The cited language, however, does not appear in that document. In any event, the statute forecloses the company's argument. The "nature of the production process" in § 1677j(b)(2)(C) necessarily encompasses qualitative considerations. As the government argues, to evaluate such matters under both § 1677j(b)(2)(C) and § 1677j(b)(2)(E) "would double-count the nature of the production process within the totality of the factors." ECF 41, at 26.

The company also contends that Commerce's refusal to include qualitative considerations in its value-added determination departs from previous practice.

---

Appx0001261 (discussing 73 Fed. Reg. 21,580, 21,585). In a second, it "did not provide an explicit determination as to whether the value of processing was small." *Id.* (citing 64 Fed. Reg. 40,336, 40,341–43). And in a third, the Department "stressed" that its "not small" finding "was an anomaly" because the percentage fell within a range (12–26 percent) it had found to be "small" in previous cases. Appx0001261–0001262 (citing 77 Fed. Reg. 6537, 6539). That anomaly resulted from the agency basing its "not small" finding on "the extensive and substantial processing that occurred." Appx0001262. In this case, Commerce explained that such qualitative considerations should have no bearing on "the percentage calculated under" § 1677j(b)(2)(E). *Id.*

*See* ECF 36, at 52. But the previous agency decisions BYD cites are of limited value. To begin with, they antedate the applicable regulation for circumvention inquiries, which requires assessing the "value of processing" based on "the *cost* of producing the part or component." Appx0001259 (emphasis added and quoting 19 C.F.R. § 351.226(i)). Commerce observed that "[c]osts are measured numerically, as is the value of merchandise." *Id.* It discussed its prior decisions and explained that they referred to "the overall decision of whether processing is minor or insignificant or the overall determination of whether circumvention is occurring," rather than the specific § 1677j(b)(2)(E) factor. Appx0001260. Even if the Department changed course, it sufficiently explained its rationale for doing so. *See Al Ghurair*, 65 F.4th at 1360 (stating an agency is not bound by its prior determinations if it explains its reasons for departing from past practice).

5

BYD complains that for purposes of § 1677j(b)(2)(A), Commerce compared the company's level of investment in Cambodia to the level made by its Chinese affiliates "on an absolute basis (*i.e.*, total value of investments made) rather than on a per-megawatt basis (*i.e.*, value of the investments relative to production)." ECF 36, at 60.[11] It says this was "unreasonable and highly distortive" because the Cambodian

---

[11] FPL joins this argument. ECF 38, at 27–28.

operations serve a "vastly smaller market" than the Chinese affiliates who serve "the very large Chinese and global markets." ECF 36, at 60–61. It also asserts that the agency's approach is wrong because it "ignores the very different scales of production in the two countries. The Chinese industry has invested in a large upstream industry that supplies virtually all of the world's demand for polysilicon wafers, whereas the Cambodian industry is manufacturing cells and modules for the U.S. and (relatively small amounts) for certain other markets." *Id.* at 61.

As the government argues, *see* ECF 41, at 32, the Department observed that the statute does not speak to how the level of investment should be calculated. Appx0001213. Doing so here using the "per-unit" methodology proffered by BYD and FPL would "overlook[ ] the relative requirements of establishing ingot and wafer production facilities in China, as compared with the cell and module production facilities in Cambodia." *Id.* It thus "would dilute the large necessary initial investments required by the production volume of the facilities." *Id.* Commerce explained that it must account for the "threshold level of investment in the Chinese facilities" and that a per-unit analysis would be distortive because China's dominance in ingot and wafer manufacturing means that economies of scale result in lower per-unit investment costs. Appx0001213–0001214.

The court agrees with the government. Nothing in the statute requires the agency to calculate the level of investment in the manner BYD and FPL prefer. The administrative record, in turn, shows that the Department considered their arguments and reasonably explained why the calculation should be made on an absolute basis. Given its discretion regarding questions of methodology, that suffices.

\* \* \*

The court sustains Commerce's balancing of the § 1677j(b)(2) factors and thus its conclusion that "the process of assembly or completion" of solar cells in Cambodia is "minor or insignificant" under § 1677j(b)(1)(C).

B

BYD next attacks Commerce's § 1677j(b)(1)(D) finding that the value of Chinese components in solar cells exported to this country from Cambodia is a "significant portion of the total value" of those goods. The company zeroes in on the Department's use of surrogate data from market-economy countries, rather than the prices BYD paid, to value the Chinese inputs. *See* ECF 36, at 63–69; Appx0001239–0001240.

Commerce observed that the Tariff Act generally presumes that prices of goods from nonmarket-economy countries are unreliable because of government controls, and it found that such controls could have

distorted BYD's prices. Appx0001240. It therefore deemed it inappropriate to use the company's records to value the Chinese inputs. *Id.*

BYD objects that the agency did not contest its data's accuracy. ECF 36, at 64. "It is undisputed that Cambodia is a market economy. There is therefore no evident factual or statutory basis for Commerce to have used [a nonmarket-economy] surrogate value methodology in this case." *Id.* It adds that the agency "unlawfully overstated" the inputs' value because the surrogate values were higher than the actual prices. *Id.* at 64–65.

The government responds that it is irrelevant whether Cambodia has a market economy—the Department must value merchandise produced in the country subject to the duty orders, which in this case has a nonmarket economy. ECF 41, at 34–35. "To use Chinese input prices based on *nonmarket principles* to determine what proportion of the United States *market price* was derived from Chinese production would be irrational." *Id.* at 34.

The only significant case law the parties discuss is *Al Ghurair Iron & Steel LLC v. United States*, 536 F. Supp. 3d 1357, 1376–78 (CIT 2021), *aff'd*, 65 F.4th 1351 (Fed. Cir. 2023), which the Department also cited, *see* Appx0001239–0001240. The plaintiff there argued, as BYD does here, that the statute does not allow Commerce to use surrogate values to calculate the cost of source-country components when the third

country has a market economy. 536 F. Supp. 3d at 1376. The government responded that the agency's standard practice is to presume that nonmarket-economy costs and pricing are inherently unreliable even when the inputs are used in a market-economy country. *Id.* at 1377. The court agreed with the government and held that Congress had left a gap for the Department to fill: "Given the lack of definition of 'value' and silence as to the method to use to assess 'value,' Commerce acted reasonably." *Id.* at 1378.

BYD argues that *Al Ghurair* is no longer persuasive authority in the wake of *Loper Bright Enterprises v. Raimondo*. ECF 36, at 66–67 (citing 603 U.S. 369, 404 (2024)). Under that decision, "[a] statutory ambiguity 'is not a delegation to anybody.'" *Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575, 587 (6th Cir. 2025) (Sutton, C.J.) (quoting *Loper Bright*, 603 U.S. at 400). When faced with "an unclear statute," judges must "arrive at their own 'independent judgment' about what [it] means." *Id.* (quoting *Loper Bright*, 603 U.S. at 412).

In *Loper Bright*, however, the Court did not throw out the administrative discretion baby with the *Chevron* deference bathwater. *See id.* (citing Gary Lawson, *"Then What?": A Framework for Life Without* Chevron, 60 Wake Forest L. Rev. 57, 93–94 (2025)). "[I]t will sometimes be the case that 'the best reading of a statute is that it delegates discretionary authority to an agency.'" *Id.* (quoting *Loper Bright*, 603 U.S. at 395).

"'[B]road and open-ended' grants of authority . . . are incapable of precise definition not because they are ambiguous, but because they unambiguously convey discretion." *Id.* (quoting *Kisor v. Wilkie*, 588 U.S. 558, 632 (2019) (Kavanaugh, J., concurring in the judgment), and citing Donald L.R. Goodson, *Discretion Is Not (*Chevron*) Deference*, 62 Harv. J. on Legis. 12, 16–17 (2024)). In those circumstances, and assuming the statute provides constitutionally delegable authority and that the agency has stayed within its lane, *see id.*, the court's role is to ensure that the former's "action is both 'reasonable and reasonably explained,'" *id.* at 588 (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).

Here, the statute delegates authority to Commerce to define the general term "value" in 19 U.S.C. § 1677j(b)(1)(D). The court agrees with *Al Ghurair* and holds that the Department reasonably exercised that discretion using surrogate values rather than Chinese prices.

Consider the relevant background principles. Commerce observed that the Tariff Act generally presumes the prices of goods produced in nonmarket-economy countries are unreliable because of government controls. Appx0001240. China is such a country. *See* 46 Fed. Reg. 24,614, 24,614. The orders here impose antidumping and countervailing duties on solar cells from that nation.

That, in turn, raises a fundamental point: Countervailing duties respond to a foreign government's subsidizing of the manufacture, production, or export of merchandise, *see* 19 U.S.C. § 1671(a)(1), so it is reasonable to assume that the price of such goods, or of the inputs used to make them, reflects the subsidy. The subsidy is baked into the price. So, while BYD complains that the surrogate values were higher than the actual prices, ECF 36, at 64–65, that is exactly the point—the agency reasonably presumed that the actual prices of Chinese-made components *are* artificially low.

The Tariff Act presumes that nonmarket-economy pricing is unreliable, and there is no reason to believe that otherwise-suspect prices of goods from such countries are valid for sales just because they're made in a third country rather than the United States. Thus, the court holds that Commerce's discretionary use of surrogate data to value the cost of Chinese-made inputs was reasonable.

C

Finally, BYD contends that the statute requires the Department "to weigh the evidence and provide reasoning as to why an affirmative determination is 'appropriate.'" ECF 36, at 71 (citing 19 U.S.C. § 1677j(b)(1)(E)). It asserts that "[n]either the statute nor the SAA provides a specific definition of 'appropriate' to be applied in the circumvention context," *id.*, and that under *Michigan v. EPA*, the agency was

required to consider "all the relevant factors" and pay "at least some attention to cost." *Id.* (quoting 576 U.S. 743, 752 (2015)). According to the company, action was not appropriate in view of Presidential Proclamation 10414[12] and the Department's own precedents. ECF 36, at 72–75.

The court agrees with BYD, and the government does not dispute, that § 1677j(b)(1)(E) is an independent condition that the agency must find satisfied before it may include exports from a third country within the scope of orders applying to source-country exports. That said, the court concurs with the government that the company's "appeals to matters of cost and public policy lack merit." ECF 41, at 37.

To begin with, BYD failed to argue before the Department that the latter should consider costs in making its § 1677j(b)(1)(E) finding. Exhaustion doctrine precludes the company from now raising that contention. *See* 28 U.S.C. § 2637(d).

In any event, BYD misreads the statute, under which the *only* relevant inquiry is whether "action is appropriate under [§ 1677j(b)(1)] *to prevent evasion.*"

---

[12] In this order, the President declared an emergency with respect to the availability of reliable electricity and directed Commerce to suspend the application of antidumping and countervailing duties on solar cells and modules from Cambodia, Malaysia, Thailand, and Vietnam for two years. *See* 87 Fed. Reg. 35,067.

19 U.S.C. § 1677j(b)(1)(E) (emphasis added). It simply does not require the broad inquiry suggested by the company.

Commerce explained that the § 1677j(b)(1)(A)–(D) conditions for finding circumvention were met and that no information on the record suggested that circumvention "would cease" unless the orders were extended to cover exports from Cambodia, Appx0001271—a finding that BYD does not dispute. Therefore, the Department reasonably found "that action is appropriate under" § 1677j(b)(1)(E) to prevent evasion. *Id.* That is all the statute required at this stage.[13]

But even if the statute required the broader inquiry pressed by BYD, the agency reasonably explained why action was appropriate given the objections raised by the company. As to Proclamation 10414, nothing in it precluded the Department from finding circumvention—it just meant that the agency could not implement its affirmative finding until the proclamation expired. Appx0001272. The court further observes that, in any event, the statute gives the responsibility of

---

[13] If the Department finds all the § 1677j(b)(1) conditions satisfied, that does not automatically require it to extend duty orders to exports from third countries. It has discretion to do so based on its evaluation of the § 1677j(b)(3) factors, other considerations that it deems relevant, and input from the International Trade Commission. *See* 19 U.S.C. §§ 1677j(b)(1), (b)(3).

assessing potential circumvention to Commerce, *not* to the President, whose order was irrelevant under the § 1677j criteria.

As to the Department's prior decisions, nowhere in its original investigation did it *disclaim* future circumvention inquiries—as BYD asserts—concerning the conversion of "Chinese-origin wafers into [solar] cells in a third country." ECF 36, at 73. Instead, the agency observed that domestic producers have "*the option* of bringing additional [antidumping and countervailing duty] petitions to address any . . . concerns . . . regarding solar modules/panels assembled from solar cells produced in a third country." Appx0013244 (emphasis added). It "did not preclude circumvention inquiries" as an option when solar cells are made in third countries using Chinese components. Appx0001271.

BYD also asserts that the Department "previously confirmed that it is inappropriate to conduct a circumvention inquiry where merchandise was 'expressly and intentionally excluded from the scope of the Orders,' as was the case here." ECF 38, at 73 (citing *Walk-Behind Lawn Mowers from China*, 88 Fed. Reg. 13,434, 13,435, and quoting accompanying Memorandum of Intent to Rescind Circumvention Inquiry at 4). The company conflates the apples (the technical characteristics of products covered by an order) and oranges (the country of origin) that are the elements of scope. *See Canadian Solar*, 918 F.3d at 913. In *Walk-Behind Lawn Mowers*, the Department found a § 1677j(a)

circumvention inquiry[14] unwarranted because the original scope language expressly excluded by *technical description* the components that would be subject to the circumvention duties. *See* Memo of Intent to Rescind at 6–8. Extending the order to such components "would introduce an internal inconsistency into the scope by both excluding and including the same merchandise and would expand the scope contrary to the terms of the Orders." *Id.* at 7. Here, Commerce's circumvention determination extends the duties to the products sharing the same technical characteristics described in the original orders. Thus, no internal inconsistency as to such characteristics is created.

Insofar as the company contends that extending the orders to the same products that are the result of substantial transformation in the third country creates an internal inconsistency, the Federal Circuit's decision in *Bell Supply* forecloses that theory. *See* 888 F.3d at 1230 (explaining that when Commerce finds substantial transformation, it "can include such merchandise within the scope of an [antidumping or countervailing duty] order . . . *if it finds circumvention* under § 1677j") (emphasis added).

---

[14] In such an inquiry, the exports in question are source-country components that are shipped to the United States and then completed or assembled into products "of the same class or kind" of merchandise from the former nation that is subject to duty orders. *See* 19 U.S.C. §1677j(a)(1).

BYD's arguments challenging the Department's finding that action was "appropriate . . . to prevent evasion," 19 U.S.C. § 1677j(b)(1)(E), are unavailing. The court therefore upholds it.

\* \* \*

The court denies the motions for judgment on the agency record filed by BYD (ECF 36) and FPL (ECF 38) and sustains Commerce's determination. Judgment will enter. *See* USCIT R. 58(a).

Dated:  May 16, 2025              /s/ *M. Miller Baker*
        New York, NY              Judge